UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| DORAL BANK PR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:09-cv-1420 (AJT/JFA) |
| | ) | |
| FEDERAL HOME LOAN MORTGAGE | ) | |
| CORP. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Doral Bank PR ("Doral") and Defendant Federal Home Loan Mortgage

Corp. ("Freddie Mac") have filed cross-motions for summary judgment. [Doc. Nos. 78

and 81.] A hearing was held on September 16, 2010, following which this Court took the

motions under advisement. Upon consideration of the motions, the oppositions thereto

and the arguments of counsel, the Court concludes that Doral has failed to establish, as a

matter of law, any damages other than its claim for $124,588, judgment for which will be

entered in its favor.

### I. Background

The following facts are undisputed:

On July 11, 2008, Freddie Mac terminated R&G Financial Mortgage Corporation,

and its related entities (collectively referred to as "R&G"), located in Puerto Rico, as its

servicer of a loan portfolio of approximately 46,000 loans, with a total loan value of over

$3.8 billion. That same day, Freddie Mac entered into an Interim Servicing Agreement

("ISA") with Doral, under which Doral agreed to service, on an interim basis, the loan

portfolio previously serviced by R&G. On July 15, 2008, as Doral was preparing to receive the loan portfolio, the United States District Court for the District of Puerto Rico issued a Temporary Restraining Order (the "TRO") prohibiting Freddie Mac from terminating its servicing agreement with R&G and transferring the portfolio. That TRO was extended with Freddie Mac's consent and ultimately Freddie Mac entered into a settlement agreement with R&G, whereby R&G continued to service the portfolio until it was sold and transferred to another bank other than Doral. As a result of these events, the loan portfolio was never transferred to Doral from R&G.

Under the ISA, Freddie Mac agreed that Doral would service the portfolio to be transferred from R&G for at least 24 months. In this regard, Section 1.1 of the ISA provides:

> Interim Servicer [Doral] agrees to provide servicing for such Interim Portfolio until such time as Freddie Mac determines to transfer servicing of such Interim Portfolio. Unless the Interim Portfolio is transferred pursuant to court order or the Interim Servicers eleibility [sic] to sell mortgages to or service mortgages for Freddie Mac is suspended or terminated pursuant to section 1.3, the length of interim servicing will not be less than 24 months. If the length of interim servicing is less than 24 months, then Freddie Mac will pay to Interim Servicer the total of 24 months of servicing compensation fee minus the number of months already billed by Interim Servicer. Freddie Mac shall not be responsible for this fee if it is ordered by court to transfer the Interim Portfolio from the Interim Servicer before the expiration of 24 months or if Freddie Mac terminates or suspends the eligibility of the Interim Servicer to sell mortgages to or service mortgages for Freddie Mac pursuant to section 1.3.[1]

After it became clear that the loan portfolio would not be transferred to Doral, Doral claimed, based on Section 1.1, that it is entitled to 24 months of service

---

[1] Section 1.1 also references Section 1.3, which allows Freddie Mac to terminate Doral for cause without incurring any additional liability. Neither party contends that this litigation involves Section 1.3.

compensation fees, which total between $10 and $12.5 million, depending on the calculation method. Freddie Mac rejected that claim and on December 20, 2009, Doral filed its three count Complaint[2] against Freddie Mac, alleging (1) partial breach of contract (Count I); (2) total breach of contract (Count II); and (3) declaratory relief (Count III), and asserting its entitlement to 24 months of servicing fees. Broadly stated, Doral bases its claims on what it contends is the "clear and unambiguous" language of the ISA, and Section 1.1 in particular. Freddie Mac characterizes Doral's claims as an attempt to obtain an unwarranted windfall for work it never did since Doral never actually began servicing any loans; in any event, claims Freddie Mac, Section 1.1, as interpreted by Doral, provides for an unenforceable penalty. Doral responds that it had begun performance under the ISA sufficient to trigger its entitlement to 24 months of servicing compensation. It also contends that the fees recoverable under Section 1.1 should not be treated as a penalty but rather as a reflection of "the parties' own careful balancing of their financial interests" and the bargained for price of Freddie Mac's contractual ability to move the loan portfolio to another servicer before the expiration of a two year servicing period that Doral believed essential to its willingness to enter into the ISA. Doral Bank PR's Mem. in Supp. of Mot. for Sum. J. [Doc. No. 82]("Doral Supp. Memo.") at 38. Overall, Doral characterizes recovery under Section 1.1 as simply the enforceable guarantee that Doral specifically bargained for in order to protect itself from the substantial but not completely ascertainable impact of what in fact occurred, Freddie Mac's precipitous withdrawal from the ISA after Doral incurred the expense and

---

[2] The Court denied Freddie Mac's Motion to Dismiss [Doc. No. 14] the original complaint for failure to state a claim on March 13, 2010. Doral amended its complaint on August 2, 2010.

inconvenience of mobilizing on an emergency basis in order to begin servicing the loan portfolio.

Central to this dispute is Section 2.6 of the ISA, which provides:

> The effective date for commencement of the servicing of the Mortgages ("Effective Date") by the Interim Servicer [Doral] shall be a date that Freddie Mac determines and communicates to the Interim Servicer that Interim Servicer will be servicing the Interim Portfolio. The Effective Date, when possible, will correspond to a date when Interim Servicer obtains the files for the Mortgages.

The parties agree that Doral's entitlement to 24 months of interim servicing under Section 1.1 was conditioned on an effective date taking place under Section 2.6 (as opposed to the effective date of the ISA, which was July 11, 2008). The parties disagree, however, as to the meaning of Section 2.6, as well as whether an effective date ever took place under their respective interpretations. The parties also disagree on whether Doral sustained any cognizable damages as well as the proper measure of damages for any breach of Section 1.1.

The parties have filed cross motions for summary judgment. Doral seeks summary judgment on the grounds that, as a matter of law, the effective date occurred under Section 2.6 under either party's interpretation, and claims that it is entitled to judgment as a matter of law for 24 months of servicing fee compensation (or, in the alternative, a "breakage fee") and expenses incurred while performing under the ISA. Freddie Mac seeks summary judgment on the grounds that the effective date contemplated in Section 2.6 never occurred, Doral's entitlement, if any, under Section 1.1 was therefore never triggered, and in any event, as a matter of law, Doral has failed to establish any entitlement to damages other than $124,588 for expenses incurred in

4

preparing to service the portfolio. Alternatively, Freddie Mac argues that even if Doral's interpretation of Section 2.6 is correct, Freddie Mac is not liable for 24 months of servicing fees under Section 1.1, which relieves Freddie Mac of any such liability should a court order that the loan portfolio be transferred from Doral to another servicer. Freddie Mac claims that the TRO issued by the Court in Puerto Rico should be considered such an order.[3]

## II. Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some*

---

[3] Doral also seeks summary judgment as to certain affirmative defenses asserted by Freddie Mac as to liability, including the doctrine of collateral estoppel and issue preclusion and the doctrine of impossibility or impracticability of performance. Given the Court's disposition of the pending summary judgment motions, there is no need to rule on these aspects of Doral's motion for summary judgment.

alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original). Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 12 U.S.C. § 1452, which grants this Court jurisdiction over all civil actions to which Freddie Mac is a party, as if the suit arose under federal law.

## III. Analysis

### A.    The Interpretation of Section 2.6

Section 2.6 provides that the ISA shall be "construed in accordance with the laws of the United States" and the parties agree that the interpretation and construction of the ISA is governed by federal contract law principals. Under federal common law, contracts are interpreted by applying "standard principles of contract law – precisely the core principles of common law of contract that are in force in most states." *S&O Liquid P'ship v. Comm'r*, 291 F.3d 454, 459 (7th Cir. 2002). Based on these standard principles of contract law, to prevail on its breach of contract claims, Doral must prove: (1) the existence of a duly executed agreement; (2) performance or offer of performance by plaintiff in accordance with the terms and conditions of the contract; (3) failure by the defendant to perform under the agreement or a breach of the agreement; and (4) resulting

injury. *See, e.g., Carley Capital Group v. City of Newport News*, 709 F. Supp. 1387, 1396 (E.D. Va. 1989).

In order to determine the existence of a duty under the ISA, the Court must interpret the ISA by looking to the parties' objective manifestations of intent, as represented by the plain language of the ISA itself. *Providence Square Assoc., L.L.C. v. G.D.F., Inc.*, 211 F.3d 846, 850 (4th Cir. 2000). If the contract language is ambiguous, the Court may resort to using extrinsic evidence to uncover the intent and the proper interpretation of the contract. *Id.* at 850. "The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts." *Hunt Constr. Group v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002). The Fourth Circuit has explained the Court's role in deciding a summary judgment motion in a contract dispute:

> A court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation. Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if susceptible to two reasonable interpretations. The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis. If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.

*World-Wide Rights Ltd. Partnership v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992) (internal citations and quotations omitted).

The fundamental difference in the parties' interpretation of Section 2.6 is whether it requires Freddie Mac to communicate to Doral a specific date on which Doral is to begin servicing the portfolio in order to trigger Doral's servicing obligation and its concomitant entitlement to at least 24 months of servicing fees. Freddie Mac reads Section 2.6 as requiring precisely that while Doral, on the other hand, claims that its obligation to service the loans and its entitlement to at least 24 months of servicing began on the date that Freddie Mac told Doral that it will be the interim servicer. Doral claims that date was as early as July 11, 2008, but in no event later than July 14, 2008, when it was told to appear with Freddie Mac at the offices of R&G in order to begin the process of transferring the portfolio, or July 15, 2008, when it continued to meet with Freddie Mac and plan for the transfer of the portfolio to Doral. In any event, Doral contends that the effective date was triggered under Section 2.6 even under Freddie Mac's interpretation, given the communications between Freddie Mac and Doral.

After extensive discovery, neither party has offered any extrinsic evidence concerning what the persons who negotiated the ISA intended in Section 2.6. The only relevant extrinsic evidence before the Court with respect to the ISA relates to the circumstances under which the parties entered into the ISA and their conduct and statements during the period July 11 through July 15, 2008, before the parties learned of the TRO that was issued on July 15, 2008. After considering the record before the

8

Court,[4] the Court finds that Section 2.6 is unambiguous and that Freddie Mac's interpretation of Section 2.6 is correct as a matter of law. Reading the ISA as a whole, and Section 2.6 in particular, the Court concludes that under the circumstances in which the parties entered into the ISA, the only reasonable interpretation of Section 2.6 is that the parties intended that the "effective date" contemplated by Section 2.6 would be a date that Freddie Mac would communicate to Doral as the date when Doral would begin its servicing obligations. Freddie Mac, by virtue of entering into the ISA on July 11, 2008, had already determined and told Doral that it wanted Doral to be the interim servicer of the loan portfolio once it was transferred from R&G to it; and the parties must have intended the effective date under Section 2.6 to play some other role. *See also* ISA Section 2.18(a) ("[Doral] acknowledges and agrees that it shall service the Mortgages on an interim basis until this Agreement is terminated and/or such servicing is subsequently transferred by Freddie Mac or pursuant to a court order."). To interpret Section 2.6 as Doral proposes eliminates any distinction between the "effective date" for the purposes of Section 2.6 and the effective date of the ISA generally, July 11, 2008, and violates the cardinal rule of contract construction that a contract must be interpreted in such a way as to not eliminate any provision of the contract but to give meaning to each provision of the contract. *See Fortec Constructors v. United States,* 760 F. 2d 1288, 1292 (Fed. Cir. 1985) ("an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless"); *Arizona v. United*

---

[4] At the hearing held on March 12, 2010, the Court denied Freddie Mac's Motion to Dismiss, noting that the Court needed a more complete record as to the circumstances and context in which the ISA was entered into in order to determine whether Section 2.6 was ambiguous.

*States*, 575 F.2d 855, 863 (Ct. Cl. 1978) ("provisions of a contract must be ... interpreted so as to harmonize and give meaning to all of its provisions, and that an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless [or] superfluous"). Second, the last sentence of Section 2.6 provides that "[t]he Effective Date, when possible, will correspond to the date when the Interim Servicer [Doral] obtains the files for the Mortgages." This sentence makes clear that the "effective date" is not just the date on which Freddie Mac tells Doral that it will at some point be the interim servicer, but the date on which Doral is to begin its servicing. Moreover, the role that the "effective date" under Section 2.6 plays with respect to certain rights, duties and obligations on the part of Doral, apart from Section 1.1, makes clear that the parties contemplated the "effective date" as a date communicated to Doral as the start of its obligations with respect to the servicing of the loan portfolio. *See* ISA Section 2.4(b) (pertaining to servicing warranties); Section 2.7 (pertaining to certain notices); and Sections 2.8, 2.9, 2.10, 2.11 and 2.15 (pertaining to certain periodic reports).

While Section 2.6 contemplates that the effective date will when possible occur on the date that the files are transferred to Doral, it leaves open the possibility that the effective date can occur on a date other than the date of transfer of the portfolio; and what remains unclear under Section 2.6 is how Freddie Mac must communicate the effective date to Doral. Based on the record before the Court, there remains a genuine issue of material fact concerning whether Freddie Mac, through word or deed, "communicated" a

date that would serve as the "effective date" for the purposes of Section 2.6.[5] As a fact finder is required to resolve that factual issue, summary judgment is denied to both parties on the issue whether Freddie Mac's duty to pay 24 months of servicing compensation fees to Doral was triggered.

**B.     Freddie Mac's affirmative defense under Section 1.1**

Freddie Mac also contends that, even if the effective date had occurred under Section 2.6, it had no liability for the 24 months of servicing under Section 1.1 because of the TRO and seeks summary judgment on that basis.

Section 1.1 provides that "Freddie Mac shall not be responsible for this [minimum servicing compensation] fee if it is ordered by court to transfer the Interim Portfolio from the Interim Servicer before the expiration of 24 months." While Freddie Mac admits that no such court order to transfer the loan portfolio was ever issued because R&G never transferred the files to Doral in the first place, Freddie Mac contends the TRO should be considered the same as a court order transferring the files away from Doral. This argument fails as a matter of law for two reasons. First, as Freddie Mac concedes, the TRO did not transfer the portfolio from Doral. This Court will not assume that the TRO is the same as an order transferring the portfolio for the purposes of Section 1.1. In this regard, it is impossible to determine what the district court issuing the TRO would have done had the portfolio, in fact, already been transferred to Doral. Second, Freddie Mac's

---

[5] For example, Freddie Mac's alleged actions include telling Doral on July 11, 2008 to come to the R&G offices to facilitate the file transfer on July 14, 2008 and developing a schedule to transfer the files with Doral on July 15, 2008. Based on this and other communications between the parties, Doral assembled a loan servicing team; and Doral contends that even under Freddie Mac's interpretation of Section 2.6, which the Court finds correct, Freddie Mac communicated an "effective date" for the purposes of Section 2.6.

position assumes that Section 2.6 necessarily mandates the effective date to take place on or after the transfer of the files. As the Court has ruled, the effective date under Section 2.6 is not necessarily the date of the file transfer, since Section 2.6 leaves open the possibility that the effective can take place before the transfer of the portfolio. For this reason, Freddie Mac's argument that the TRO must necessarily be considered an order to transfer the files for the purposes of Section 1.1 fails.

### C. Damages

Both parties move for summary judgment as to damages.

Doral claims that it is entitled to summary judgment as to its claim for: (1) the "service compensation fees" it would have received for a 24 month period;[6] (2) the "ancillary fees" it would have earned based on late fees and bad check fees;[7] (3) the expenses it actually incurred in preparing to service the loan portfolio;[8] and (4) the expense of remaining "on hold" at Freddie Mac's request, following the issuance of the TRO.[9] Freddie Mac seeks summary judgment as to Doral's claims for damages on the grounds that Doral has failed as a matter of law to prove damages under any recognized theory of recovery other than its claim for $124,588, which Freddie Mac concedes is due and owing.[10] More specifically, Freddie Mac argues that Doral's claim for 24 months of

---

[6] Calculated as $10,876,954.

[7] Calculated at $3,776,376.

[8] Calculated at $124,588.

[9] Calculated at $1,383,960.

[10] Freddie Mac also claims that it has been attempting for some time to pay this amount to Doral, but that Doral has refused such payment. *See* Def's Mem. of Law in Opp. to Pltf's Mot. for Sum. J. [Doc. No. 85] at 1.

servicing compensation fees amounts to a penalty and therefore an unenforceable liquidated damages provision and that it cannot be considered an "option price," or a "breakage fee," as Doral alternatively claims. Freddie Mac also claims that Doral's economic model is inadequate since the record does not adequately support the 13% loan reduction factor or other data incorporated into the Model and the Model fails entirely to account for certain conditions in the mortgage market that Doral concedes existed during the relevant 24 month period.

General contract principles pertaining to damages have been summarized as follows:

> "A plaintiff [] must prove two primary factors relating to damages. First, a plaintiff must show a causal connection between the defendant's wrongful conduct and the damages asserted. Second, a plaintiff must prove the amount of those damages by using a proper method and factual foundation for calculating damages." *Saks Fifth Avenue, Inc. v. James, Ltd.,* 272 Va. 177, 630 S.E.2d 304, 311 (2006) (internal citation omitted). However, "[d]amages need not be established with mathematical certainty. Rather, a plaintiff is required only to furnish evidence of sufficient facts to permit the trier of fact to make an intelligent and probable estimate of the damages sustained." *Estate of Taylor v. Flair Property Associates,* 248 Va. 410, 448 S.E.2d 413, 416 (1994).

*Kraft Foods N. Am., Inc. v. Banner Eng'g & Sales, Inc.,* 446 F. Supp. 2d 551, 573 (E.D. Va. 2006). Based on the record before the Court, the Court concludes that Doral has not established, as a matter of law, its entitlement to any damages, other than its claim for $124,588 in expenses that it incurred in preparing to transfer and service the loan portfolio.

1. *Doral's claimed damages for "servicing compensation fees."*

Doral seeks an award of those servicing compensation fees that Freddie Mac would have paid under the terms of the ISA for a period of 24 months, without any

reduction for the costs associated with serving that portfolio.[11] Doral justifies this approach, and seeks summary judgment with respect to the damages calculated under this approach, based on the "clear and unambiguous language" of Section 1.1, as well as Sections 2.17(a) and 2.18(d) of the ISA.[12]

In the face of Freddie Mac's challenges to Doral's claim to gross servicing fees, without any reduction for expenses, Doral relies on a number of damages theories and characterizes the language of the ISA to come within those theories. First, Doral claims that Doral's entitlement to 24 months of servicing compensation fees are enforceable liquidated damages. Alternatively, Doral describes the claimed fees as an "option price" that Freddie Mac is obligated to pay in order to exercise its "option" to transfer the servicing to another company, akin to what some courts have enforced as "early termination fees." Finally, Doral likens the servicing compensation fees generated by the portfolio over 24 months as essentially the same as a "breakage fee" that courts have enforced in the context of merger and acquisition agreements.

---

[11] Doral calculates the servicing compensation fee by multiplying the per-loan servicing fee specified in Exhibit C to the ISA by the number of loans in the portfolio, which it calculates based on a 13% annual decrease in the number of loans in the portfolio. Based on these calculations, Doral claims damages in the amount of $10,876,954 for the 24 month servicing period. Alternatively, it claims $12,178,848, based on calculations that do not reduce the loan portfolio for the last 12 months of the 24 month servicing period.

[12] Section 1.1 provides, in relevant part, that "...the length of interim servicing will not be less than 24 months" and that "[i]f the length of interim servicing is less than 24 months, then Freddie Mac will pay to the Interim Servicer [Doral] the total of 24 months of servicing compensation." The "servicing compensation fee" is defined in Exhibit C as the monthly fee per serviced loan specified in Exhibit C, Section C.2. Section 2.17(a) provides that if Freddie Mac terminates the ISA, "Freddie Mac shall compensate Interim Servicer [Doral] in accordance with Section 1.1." Section 2.18(d) provides that Doral is entitled "to any and all amounts due and owing under this Agreement [ISA] notwithstanding termination of this Agreement or any subsequent transfer of servicing from Interim Servicer [Doral] to another servicer."

In determining whether a contractual damage provision amounts to enforceable liquidated damages or an unenforceable penalty, courts consider a number of factors, including (1) the anticipated or actual loss caused by the breach and (2) the difficulty of proof of loss. Rest. 2d of Contracts § 356 (1981). Liquidated damages provisions are only enforceable "when the actual damages contemplated at the time of the contract are not certain and are difficult to measure with accuracy and when the stipulated amount of damages is not out of all proportion to the probable loss." *Perez v. Capital One Bank*, 258 Va. 612, 616, 522 S.E.2d 874 (Va. 1999); *see also Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. DCI Signs & Awnings, Inc.*, Civil Action No. 1:08-cv-15, 2008 U.S. Dist. LEXIS 72913, 17-18 (E.D. Va. Sept. 15, 2008) (federal common law and Virginia law both apply the standards specified in Rest. 2d of Contracts § 356).

Here, the anticipated or actual loss to Doral from a failure to service the portfolio for at least 24 months is the net profit that would have been realized from servicing the portfolio, together with incurred but unrecovered out of pocket costs. The lost net profit, if any, is substantially less than the gross fees that would be realized from servicing the portfolio since Doral would have incurred substantial expenses by way of staff and general overhead to service the portfolio.[13] In addition, calculating those damages based on net-profit is a straightforward exercise, well within recognized methods of proof. Projecting the reduction in the number of loans in the loan portfolio over a 24 month period is well within the scope of admissible expert and other testimony. Indeed, in this case, the actual number of loans from the portfolio that were serviced during the relevant

---

[13] In this regard, Doral testified, through its designated representative as to damages, that Doral lost money in 2008, and did not know what profit margins Doral's mortgage servicing business generated. *See* Reyna Dep., at 230:7-231:2.

24 month period was ascertainable, as were the actual costs associated with servicing the portfolio. Doral has been in the loan serving business for some time and has the ability based on its own experience as well as through outside experts to establish costs associated with servicing the portfolio. Certainly, incurred but unrecovered out of pocket costs can be determined and in fact, Doral makes such a claim in the amount of $124,588, which Freddie Mac concedes. Additional structural costs, such as overhead attributable to an expansion of Doral's business to service the loan portfolio may present more difficult proof issues, but there is nothing in this record that gives the Court reason to find that calculating these costs is not feasible or that the recovery sought under Section 1.1 of the ISA bears any reasonable relationship to any such costs.[14]

Doral also contends that damages would be difficult to prove in light of the other banking services that Doral anticipated selling to the new customers it would receive through the ISA. The record before the Court, however, does not contain sufficient evidence to determine what those other services would have been, whether and to what extent Doral would have realized a profit from such other services or whether the 24 months of servicing compensation fees, however calculated, has any relationship to the profits that would be realized from such cross-selling. "Damages that are contingent, speculative, and uncertain are not recoverable because they cannot be established with reasonable certainty." *Comstock Potomac Yard, L.C. v. Balfour Beatty Constr. LLC*, Civil

---

[14] Indeed, Doral requests $1,383,960 in what it describes as "incremental operating costs" based upon a historical expense approach. *See* Doral Supp. Memo. at 31-33. While this Court finds that Doral has failed to adequately substantiate the basis for the amount requested for the reasons discussed below, this Court notes that Doral implicitly agrees that the use of cost models can, when properly supported, be an appropriate means of estimating operating expenses. The parties appear in agreement that the detailed cost figures in the record are subject to the protective order entered in this case and the Court will therefore not refer to the exact numbers in this opinion.

Action No. 1:08-cv-894, 2009 U.S. Dist. LEXIS 73206, 47 (E.D. Va. Aug. 14, 2009). For these reasons, the Court concludes that an award of 24 months of servicing compensation fees, without any reduction for expenses that would have been incurred in servicing the loan portfolio, would be an unenforceable penalty rather than an enforceable liquidated damages provision.

The Court also concludes that Section 1.1 does not function as an enforceable "option price" for Freddie Mac's early termination of the ISA. First, it is not structured or presented as containing an "option price," as Section 1.1 does not contain any stipulated amount and the servicing compensation fee is only one of many possible sources of income and reimbursable expenses payable under the ISA, as set forth in Exhibit C.[15]  Doral has also not demonstrated any intention by the parties to consider Section 1.1 as containing the price of an "option" in favor of Freddie Mac and there is no demonstrated, reasonable relationship to any anticipated or projected costs to which Doral could have been exposed were the ISA terminated in less than 24 months. *Compare with B&S Pike, Inc. v. Dime CRE, Inc.*, Civil Action No. 00-6419, 2002 U.S. Dist. LEXIS 11843, 5-9 (E.D. Pa. Feb. 11, 2002) (explaining fee associated with breaking

---

[15] Doral has submitted two, clearly distinguishable unpublished cases from the Ninth Circuit enforcing early termination fees ("ETF"). *Hutchison v. Yahoo! Inc.*, No. 09-55847, 2010 U.S. App. LEXIS 19505 (9th Cir. Sept. 20, 2010) (unpublished); *Schneider v. Verizon Internet Servs., Inc.*, No. 09-55580, 2010 U.S. App. LEXIS 19974 (9th Cir. Sept. 27, 2010) (unpublished). Both cases involved ETF in connection with the cancellation of a defined length internet access contract. In *Hutchinson*, the customer was charged $200 for terminating his service early after he received $175 in discounts and waived installation fees in exchange for committing to a minimum contract term. In *Schneider*, the customer was charged an ETF of $99 after the company waived a $79.99 installation fee and provided a $10 per month discount on the monthly service fee. In both cases, the ETF was a single lump sum that had a direct relationship and close proximity to the costs the customers avoided under an alternative contractual arrangement.

loan agreement could be viewed as an option price, but analyzing fee under liquidated damages framework and finding breakage fee was not excessive on the facts due to magnitude of interest rate exposure involved); *see also* Rest. 2d of Contracts, § 356, cmt. c ("Although the parties may in good faith contract for alternative performances…a court will look to the substance of the agreement to determine whether this is the case or whether the parties have attempted to disguise a provision for a penalty that is unenforceable under this section.").

Doral's "breakage fee" theory suffers from the same problems as its "liquidated damages" and "option price" theories: there is no evidence that the parties ever contemplated Section 1.1 in such terms, the amount Doral claims is not identified as such and it has no demonstrated proximity to any injury, loss or expense.[16] The Court therefore concludes as a matter of law that gross servicing compensation fees for 24 months cannot be awarded as an enforceable "breakage fee,"[17] comparable to a break-up fee within the context of a business combination where one party pays the other a fee for exercising its right under the agreement not to consummate a merger.

Moreover, the actual amount claimed under each of these theories of recovery is premised on Doral's model (the "Model"), which contains projections, both for income

---

[16] This Court finds no reason to believe that describing a provision as a "brakeage fee" would obviate the need to analyze the same traditional factors that are used to determine whether a contract term is appropriate or an unenforceable penalty. *See* Rest. 2d Contracts § 356 cmt. c (explicitly contemplating the use of alternative language to characterize forms of damages including through means such as structures for alternative performance, and explaining that, regardless of the formulation used, "a court will look to the substance of the agreement to determine" whether a clause is enforceable).

[17] Doral actually argues that Section 1.1 provides for an enforceable "breakage fee" only in the context of its alternative claim for $12,178,848, (rather than 10,876,954), which is based on 24 months of servicing compensation fees, without any reduction in the number of loans in loan portfolio, rather than with a 13% annual reduction.

and also for certain expenses that would be experienced with respect to the portfolio. The Court therefore also concludes that Doral's claim for 24 months of servicing compensation fees fails under any of Doral's proposed theories of recovery on the grounds that the Model is deficient as a matter of law.

The only factual support in the record for the Model is the testimony of Roberto Reyna, whom Doral has not designated as an expert witness but who testified during discovery as Doral's designated representative on damages. In July 2008, Reyna held the position of Head of Investor Relations for Doral; and in that capacity he put together the Model for the purposes of evaluating the economic consequences of the portfolio that was to be transferred to Doral by Freddie Mac. Reyna disclaimed any personal knowledge concerning any of the information in the Model, which he obtained from other Doral employees, or in many instances even the most basic understanding of what the numbers contained in the Model were based on.

In addition, the Model fails to take adequate account of market conditions that Doral concedes would affect the servicing experience of the portfolio over 24 months. Doral, through Reyna, acknowledged that falling interest rates would result in a reduction in the number of loans in the portfolio as loans in the portfolio with higher interest rates were re-financed and pre-paid, with the predictable result that servicing fees would decrease. At the same time, because of the poor economy, loan defaults would increase and the overall servicing cost per loan to Doral would increase. The Model makes no attempt to reflect these recognized market forces that would exist during the 24 month period other than through the use of the 13% factor, which Doral describes as "a reasonable estimate of the speed of prepayment and based upon Doral's historical

experience in Puerto Rico with input from an outside expert on mortgage loan behavior." Doral Supp. Memo. at 30. Yet the record before the Court contains nothing that supports this factor other than the testimony of Reyna who testified that this percentage was obtained from the Mortgage Industry Advisory Corporation without any knowledge concerning where it came from, on what basis it was generated, or why it would constitute a reasonable estimate for the portfolio that was to be transferred to Doral. *See Benham v. World Airways, Inc.*, 432 F.2d 359, 361 (9th Cir. 1970) (explaining optimistic financial forecasts are "worth no more than the factual data upon which they were based"). Likewise, there is no information in the record that would allow the Court to assess the appropriateness or reasonableness of the 13% factor for the purposes of calculating damages under any of Doral's theories. Without a reliable estimate concerning the changes that Doral concedes would take place in the portfolio over time, Doral cannot show to a reasonable certainty the amount that it have received in servicing compensation fees. *See Kraft Foods N. Am., Inc.*, 446 F. Supp. 2d at 573; *Carley Capital Group*, 709 F. Supp. at 1398-99 (denying plaintiff's lost profits damages as based on speculation and conjecture where the Plaintiff's forecasts of expenses and increases were not sufficiently established to make damages reasonably certain).

*2. Doral's claim for "ancillary fees."*

For similar reasons, this Court concludes that Doral's claims for "ancillary fees" in the amount of $3,776,376 are speculative as a matter of law.[18] Doral's claims for "ancillary fees" are also based on the Model, using the same 13% prepayment rate that

---

[18] Doral's entitlement to "ancillary fees" is set forth in the ISA, Ex. C.1(B), which provides: "Ancillary Income consists of all income charged by Interim Servicer [Doral] to Borrowers for 1) Late Charges, 2) Returned Check Charges, and 3) Assumption Fees. Interim Servicer shall receive 50% of all Ancillary Income."

this Court has concluded is not sufficiently supported by the record. Doral also relies upon what it describes as an "expected per-loan value" based on its "historical experience servicing mortgage loans in Puerto Rico." [Doc. No. 82, at 31.] However, a review of the record reveals that the sole Doral witness on this point, Reyna, testified that he did not know what information was used to generate the "expected per loan value" figure, making it impossible to determine whether this figure is appropriate or reasonable. As a result, Doral's request for "ancillary fees" is also denied.

*3. Doral's claim for incremental costs as a result of remaining "on hold."*

Doral's claim for $1,383,960 in incremental costs as a result of remaining "on hold" while Freddie Mac was in settlement negotiations with R&G also cannot withstand scrutiny. This amount was reached by multiplying a certain number, representing the fixed cost of servicing a mortgage, by the number of mortgages to be serviced for the number of months that Doral was kept "on hold" and thus incurred expenses. Doral, however, has failed to submit evidence sufficient to support its damages to a reasonable certainty. There is nothing in the record that would justify the use of this cost per loan figure. Roberto Reyna testified that he derived that number from an annual cost per loan number that he had obtained from another corporate employee. He therefore had no personal knowledge of what the number was based on. While this alone is not necessarily fatal, there is nothing in the record that would allow this Court to assess in any respect whether this per loan cost has any relationship to the expenses that Doral actually incurred in remaining on "hold." While there is evidence that Doral had hired approximately 40 people in anticipation of servicing the loan, there is no indication that the monthly cost figure used to calculate this category of damages related in any way to

the expense associated with that group. For these reasons, Doral has failed to provide sufficient evidence, as a matter of law, to support a claim for "on hold" incremental costs.

    4.    *Lost profits as a measure of damages.*

While Doral has generally disclaimed relying upon a "lost profits" damages model, *see, e.g.,* Doral Bank PR's Reply in Supp. of Mot. for Sum. J. [Doc. No. 88] at 16, Doral has argued that the Model reflects information sufficient to calculate that figure. In this regard, Doral contends that there exists in the record enough information for it to show both total fees that would have been realized as well as the costs associated with servicing the portfolio, even if it is not exact. *See Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379 (1927) ("Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate."); *Kraft Foods N. Am., Inc.*, 446 F. Supp. 2d at 573 ("damages need not be established with mathematical certainty. Rather, a plaintiff is required only to furnish evidence of sufficient facts to permit the trier of fact to make an intelligent and probable estimate of the damages sustained.").

The Model does contain certain numbers that project both income and expenses with respect to the loan portfolio, including a certain cost figure per loan serviced that was used to calculate the "on hold" cost for approximately 4 months and Doral argues that the same cost per loan figure can be used to calculate the net profit that would have been realized on the portfolio over 24 months. However, for the same reasons described above, the cost information in the Model is insufficient as a matter of law to allow the calculation of Doral's profit on the portfolio over a 24 month period. First, there is

insufficient evidence as to how this cost figure was arrived at, or if it properly took into account all of the costs that would be associated with transferring and servicing over 46,000 new mortgages to Doral. The mere fact that Doral used that figure to calculate the costs of servicing the mortgages before the transfer of the portfolio took place is not enough, as a matter of law, to show any reasonable certainty as to actual costs that would have been incurred, especially since Reyna did not know himself how the cost number was derived. *See Benham*, 432 F.2d at 361 (discussing the use of the plaintiff's own profit predictions, the court held "those cheerful prognostications are worth no more than the factual data upon which they were based. The factual foundation was absent, and the opinions accordingly collapse."). This Court, therefore, finds that an award based upon a "lost profits" theory could not be supported by the record.

    *4.    Doral's allegations of bad faith against Freddie Mac.*

    Doral seeks to limit the amount of proof it must present in order to survive a summary judgment challenge as to damages by taking issue with Freddie Mac's failure to perform its obligations under the ISA in good faith and deal fairly with Doral after the issuance of the TRO[19] and also Freddie Mac's refusal to produce documents and information in discovery concerning the actual servicing experience with the loan portfolio that was to be transferred to Doral. Based on this alleged conduct, Doral argues that it has met its burden to show damages under Fed. R. Civ. P. 56(e)(2), to an extent sufficient to shift to Freddie Mac the burden of introducing specific data or information

---

[19] Doral claims this conduct included, among other things, its failure to contest the TRO, its failure to inform the court that granted the TRO of Doral's status, and its entering into a settlement agreement with R&G.

that creates a genuine issue of material fact concerning the numbers that Doral has used as the basis for its damages claim, which Freddie Mac has failed to do.

Doral is not excused from the evidentiary showings it is required to make to survive Freddie Mac's motion for summary judgment either because of Freddie Mac's conduct after entering into the ISA or its refusal during discovery to produce certain requested information concerning the actual performance of the portfolio. Freddie Mac's alleged bad faith conduct did not prevent Doral from marshalling and presenting the evidence it needed to support a legal cognizable damages claim. Rather, in the face of Freddie Mac's discovery objections, Doral did not move to compel the production of the documents pertaining to the actual performance of the portfolio; and while the Court agrees that Doral did not necessarily need to use this actual servicing data to determine damages, it remain obligated to show damages to a reasonable certainty through some other evidentiary showing, which it has failed to do beyond its undisputed claim for $124,588.

**D.     Declaratory Relief**

Doral also seeks declaratory relief in Count III. The decision to grant or deny declaratory relief is vested in this Court's discretion. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 286-87 (1995) ("the Declaratory Judgment Act [is] an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant") (internal punctuation omitted); *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996 ) ("This power has consistently been considered discretionary."). Declaratory judgments are appropriate "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and ... when it will terminate and afford relief from

uncertainty, insecurity, and controversy giving rise to the proceeding." *Centennial Life Ins. Co.*, 88 F.3d at 257. In this case, issuing a declaratory judgment will not serve a useful purpose in clarifying and settling the legal relations at issue. The events at issue in this case are not ongoing, and do not subject the parties to further uncertainty, insecurity or controversy. Therefore, Doral's claim for declaratory relief is dismissed with prejudice.

### Conclusion

For the above reasons, Doral's Motion for Summary Judgment [Doc. No. 81] will be granted as to its claim for expenses in the amount of $124,588 and denied as to all other damages, including specifically servicing fees, ancillary fees and "on hold" costs. Freddie Mac's Motion for Summary Judgment [Doc. No. 78] is denied as to liability but granted as to all damages other than the amount of $124,588 and a Final Judgment Order will be entered in favor of Doral in the amount of $124,588 as to Doral's claims for breach of contract. Doral's claim for declaratory relief will be dismissed.

An appropriate Order will follow.

_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
October 7, 2010

25